

IN THE

# Court of Appeals of Indiana

Jason Kelly and Myka Kelly,

*Appellant-Plaintiffs*

v.

State of Indiana, et al,

*Appellee-Defendants*



FILED

May 16 2024, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

May 16, 2024

Court of Appeals Case No.
23A-CT-1845

Appeal from the Wabash Circuit Court

The Honorable Davin G. Smith, Special Judge

Trial Court Cause No.
85C01-2206-CT-329

---

**Opinion by Judge Pyle**
Judges Tavitas and Foley concur.

**Pyle, Judge.**

## Statement of the Case

Jason ("Jason") and Myka ("Myka") Kelly, for themselves and their minor children A.S. ("A.S."), A.T.M., A.E.M., A.C.M., J.T.K., and J.E.K., (collectively "the Kellys") filed a breach of contract claim ("the breach of contract claim") and a 42 U.S.C. § 1983 claim ("the § 1983 claim") against Department of Child Services ("DCS") family case managers Sandra Sell ("FCM Sell"), Brandy Shaver ("FCM Shaver"), and Valerie Eiler ("FCM Eiler"), DCS family case manager supervisor John Lane ("Supervisor Lane"), DCS Wabash County Office Director Julie Hobbs ("Director Hobbs"), Larry Noland ("Noland"), and the State of Indiana (collectively "the State"). The State filed a partial motion to dismiss the breach of contract claim, which the trial court granted. The Kellys appeal the trial court's grant of the State's partial motion to dismiss the breach of contract claim. Reviewing the trial court's order as a ruling on a motion for summary judgment because the trial court considered a release and settlement agreement ("the Agreement") that the State attached to its partial motion to dismiss, we conclude that the trial court did not err in entering judgment as a matter of law in favor of the State.

We affirm.

## Issue

> Whether the trial court erred when it entered judgment as a matter of law in favor of the State.

## Facts

The facts as set forth in the Kellys' complaint reveal that in 2020, the Kellys lived in Wabash County with their two children and Myka's four children from previous relationships (collectively "the children"). In January 2020, FCM Sell and FCM Shaver investigated the report of a domestic dispute at the Kellys' home. On February 5, 2020, FCM Shaver, FCM Eiler, and Supervisor Lane consulted with Director Hobbs about removing the children from the Kellys' home. That same day, FCM Shaver, FCM Eiler, and Supervisor Lane removed the children from the Kellys' home without first obtaining a court order. The children were adjudicated to be children in need of services ("CHINS"), and FCM Sell was assigned to the children's case. DCS returned the children to the Kellys in May 2020 during the pendency of the CHINS proceedings.

In August 2020, Noland, the father of Myka's then four-year-old son, A.S., was placed in a community transition program after serving time in the Department of Correction for a felony conviction for neglect of a dependent resulting in a serious injury. Noland had pled guilty to this offense in March 2015 after a child in his care had exhibited symptoms consistent with shaken baby syndrome.

FCM Sell met Noland at the end of October 2020 when she was supervising a visit between Noland, who was then on home detention, and A.S. That night, Noland texted FCM Sell that he had looked up her skirt during the visit and had seen the tattoos on her thigh. "They then talked about how [FCM Sell]

was not wearing panties at that meeting, how [FCM] Sell could stop by his house to 'check' his bedroom out, and how [FCM Sell] could 'pop' [Noland's] post-prison 'cherry.'" (App. Vol. 2 at 26). FCM Sell and Noland then exchanged sexually explicit photographs.

[6] FCM Sell and Noland subsequently became involved in a sexual relationship. During the course of this relationship, FCM Sell, who was aware of Noland's prior felony conviction for neglect of a dependent resulting in a serious bodily injury and who knew that Noland was on home detention, undertook efforts to undermine A.S.'s placement with the Kellys. For example, FCM Sell accused Jason of sexually abusing A.S. and made efforts to place A.S. with Noland.

[7] In December 2020, DCS filed a petition for the Kellys to show cause why they should not be held in contempt for violating the CHINS order. DCS supported this show cause petition with an affidavit from FCM Sells that included false allegations against the Kellys, including new allegations that the Kellys had abused and neglected the children. The following day, DCS filed a motion to modify the disposition and removed the children from the Kellys' home. A.S. was placed with Noland, and the other children were placed in foster homes.

[8] In February 2021, Myka filed a motion to have the children returned to her care, which the trial court denied. In March 2021, Director Hobbs learned about FCM Sell's relationship with Noland, and on March 10, 2021, Director Hobbs terminated FCM Sell from her position with DCS. The following day,

March 11, 2021, DCS filed a motion to place A.S. in foster care because Noland was homeless and could not care for the child.

[9] During a CHINS hearing the following day, DCS disclosed that it had learned of inappropriate contact between FCM Sell and Noland. However, DCS did not immediately disclose the nature of the contact. After the full extent of the relationship between FCM Sell and Noland was disclosed to the Kellys, DCS returned the children to the Kellys at the end of April 2021.

[10] In the fall of 2021, the Kellys presented the draft of a complaint, which set forth their claims against DCS, to the attorney general's office. The State agreed to mediate the Kellys' claims before they filed a legal action. In January 2022, the Kellys and the State engaged in a full-day mediation. At the end of the mediation, the Kellys and the State entered into the Agreement, which provides, in relevant part, as follows:

RELEASE AND SETTLEMENT AGREEMENT

1.   This Agreement between Jason Kelly and Myka Kelly, for themselves and their minor children . . . [hereinafter referred to as Releasors] and the Indiana Department of Child Services, and all of its present and former members, officers, agents, employees, and successors, known and unknown [hereinafter referred to as Releasees], is entered into in full conciliation and settlement of the claims by Releasors in the matter of *Jason Kelly and Myka Kelly, for themselves and their minor children, A.S., A.T.M., A.E.M., A.C.M., J.T.K., and J.E.K. v. Sandra Sell, Brandy Shaver, Valeri[e] Eiler, John Lane, Julie Hobbs, and Larry Noland* (the "Matter"). The parties agree that the claims involved in the Matter were civil rights claims.

2.     This Release and Settlement Agreement is entered into by and between Releasor[s] and the Releasees in full settlement and satisfaction of any and all of Releasor[]s['] claims that Releasor[s] brought or could have brought against Releasees related to the events alleged in the complaint, whether in state or federal courts, through and including the date of this Release and Settlement Agreement.

3.     The parties agree to forego their right to a trial in the court systems of the United States and the State of Indiana on the issues raised in this Matter.

4.     Releasees agree to pay Releasor[s] Two Million and Seven Hundred Fifty Thousand Dollars ($2,750,000.00) in full satisfaction of any and all claims against Releasees that Releasor[s] brought or could have brought related to the events alleged in this Matter.

\*     \*     \*     \*     \*

15.    This Release and Settlement Agreement is contingent on approval by the Indiana Attorney General and the Indiana Governor.

(App. Vol. 2 at 130, 132).

[11]    In May 2022, a deputy attorney general advised the Kellys that the required approval had not been granted and that the proposed settlement agreement had been denied. One month later, in June 2022, the Kellys filed a two-count complaint, which included the breach of contract claim and the § 1983 claim,

against the State.[1]  The § 1983 claim alleged that the State had committed multiple violations of 42 U.S.C. § 1983.[2]

[12]  In August 2022, the State filed an answer to the Kellys' complaint.  In its answer, the State asserted as an affirmative defense that "[t]he State of Indiana fulfilled its contractual obligations, in good faith and effort, pertaining to the contract between the [Kellys] and the State of Indiana."  (App. Vol. 2 at 53).

[13]  In November 2022, the Kellys served a set of discovery requests, including interrogatories, on the State.  The interrogatories sought facts related to the State's affirmative defense that it had fulfilled its contractual obligations to the Kellys in good faith.  Specifically, in the interrogatories, the Kellys asked the State to:  (1) identify all persons who had a role in the decision to approve or deny the Kelly Settlement and describe each individual's role in that decision; (2) identify all documents related to the decision to approve or deny the Kelly Settlement; and (3) identify the basis for the denial of the Kelly Settlement.[3]

[14]  In March 2023, the State filed a response to the Kellys' interrogatories.  Specifically, the State responded that the Kellys' interrogatories sought

---

[1] The Kellys did not include the Agreement in or file the Agreement with their complaint.  Indiana Trial Rule 9.2(A) provides that "[w]hen any pleading allowed by these rules is founded on a written instrument, the original, or a copy thereof, shall be included in or filed with the pleading."

[2] In July 2022, the State filed a notice of removal to federal court.  However, in September 2022, the federal court remanded the case to the trial court because the State's notice of removal had not been timely filed.

[3] Three months later, in February 2023, the Kellys filed a motion to dismiss, with prejudice, FCM Sell from the case.  The trial court granted the Kellys' motion in July 2023.

information that was privileged by: (1) the deliberative process privilege; (2) the attorney-client privilege; and (3) the attorney work product privilege. The State further responded that the Kellys were seeking documents gathered in anticipation of litigation. That same month, the Kellys filed a motion to compel the State to respond to the Kellys' interrogatories.

[15] Also, in March 2023, the State filed a partial motion to dismiss pursuant to Trial Rule 12(B)(6). Specifically, the State sought to dismiss the Kellys' breach of contract claim. In the partial motion to dismiss, the State argued, in relevant part, as follows:

> 5. The settlement agreement was conditioned on the approval of the Indiana Attorney General and Governor ("the settlement condition")[.]
>
> 6. The settlement agreement was ultimately not approved by the Indiana Attorney General and Governor[.]
>
> 7. As a matter of law, the settlement condition was an enforceable condition precedent that, when not met, rendered the settlement agreement nonbinding.

(App. Vol. 2 at 117). The State attached a copy of the Agreement to the partial motion to dismiss. The State also filed a motion for a protective order in response to the Kellys' motion to compel it to respond to the Kellys' interrogatories.

[16] Also, in March 2023, the Kellys filed a reply in support of their motion to compel and a response in opposition to the State's motion for a protective order. The Kellys also filed a response to the State's partial motion to dismiss.

At the end of March 2023, the State filed a reply in support of its partial motion to dismiss.

[17] The trial court held a hearing on the pending motions in July 2023. At the beginning of the hearing, the trial court asked the parties for their thoughts on where to begin the hearing. The parties agreed to begin the hearing with the State's partial motion to dismiss the breach of contract claim. After the parties had made their respective arguments regarding the partial motion to dismiss, the trial court stated as follows:

> As I hear the arguments from both sides today and look at the release and settlement agreement, I keep coming back to the plain language in paragraph 15: "The release and settlement agreement is contingent upon approval by the Indiana Attorney General and the Indiana Governor." How I read the complaint, how I read the agreement, how I hear the arguments today, the agreement is contingent upon the approval of the Attorney General and the Governor. For whatever reason, the Attorney General and or the Governor have not approved the agreement and so I don't see that that leaves us with any contract to breach. So, I am going to grant the State's request to dismiss count one, the breach of contract claim.

(Tr. Vol. 2 at 23).

[18] The trial court asked the Kellys where that left them on the other issues before the court. The Kellys responded that they would like to immediately appeal the trial court's decision and asked the trial court to issue a final appealable order. The Kellys also asked the trial court to "leave the remaining motions pending the outcome of that appeal." (Tr. Vol. 2 at 23).

Thereafter, the trial court issued a written order granting the State's partial motion to dismiss the breach of contract claim. The trial court's order further entered the dismissal as a final appealable order pursuant to Indiana Trial Rule 54(B). Lastly, the trial court's order stayed the Kellys' remaining claims pending the resolution of their anticipated appeal.

The Kellys now appeal.

## Decision

At the outset, we note that the State made, and the trial court granted, a partial motion to dismiss the Kellys' breach of contract claim pursuant to Trial Rule 12(B)(6) for failure to state a claim upon which relief can be granted. The trial court's grant of a motion to dismiss is proper if it is apparent that the facts alleged in the complaint are incapable of supporting relief under any set of circumstances. *Coulson-Smith v. Coulson as Trustee of Zoe E. Coulson Trust*, 210 N.E.3d 841, 845 (Ind. Ct. App. 2023). In ruling on a motion to dismiss for failure to state a claim, the trial court may look only to the complaint and may not resort to any other evidence in the record. *Id.* However, "[i]f . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Ind. Trial Rule 12(B).

Here, the State attached the Agreement to its motion to dismiss the breach of contract claim. The trial court did not exclude the Agreement and further told the parties at the hearing that it had considered the Agreement in determining

whether to grant the State's motion to dismiss the breach of contract claim. Therefore, although the State denominated its motion as a motion to dismiss and the trial court referred to the motion as such in its order, we review the trial court's order as a ruling on a motion for summary judgment because the trial court considered the Agreement. *See id.* at 846 (explaining that because the trial court considered a Tolling Agreement that the defendant attached to her response to the plaintiff's motion to dismiss, we would review the trial court's grant of the plaintiff's motion as a ruling on a summary judgment).

[23] As with any motion for summary judgment, we review de novo whether there is any genuine issue of material fact and whether the State, as the moving party, is entitled to judgment as a matter of law. *See id.* In so doing, we construe all facts and reasonable inferences in a light most favorable to the Kellys as the nonmoving party. *See id.*

[24] We now turn to the Kellys' argument that the State breached the Agreement. The State responds that it "did not commit a breach of contract because there was no legally binding agreement." (State's Br. 28). The State specifically contends that the Agreement "is not enforceable against the State because the [A]greement's condition requiring approval of the Governor and the Attorney General was not met." (State's Br. 28). We agree with the State.

[25] Our Indiana Supreme Court's decision in *Indiana State Highway Commission v. Curtis*, 704 N.E.2d 1015 (Ind. 1998), is instructive. In the *Curtis* case, the plaintiffs granted the State an easement onto their commercial property to

complete highway drainage work. Thereafter, the plaintiffs filed an action against the State alleging that the drainage work had destroyed their septic system and had caused a loss of business by restricting access to their property and rendering their parking lot useless.

[26] Before trial, the State's attorney contacted the plaintiffs' attorney to discuss a settlement. The State's attorney advised the plaintiffs' attorney that a monetary settlement required approval by the Governor and that any easement over State property to repair the plaintiffs' septic system would require approval by the Indiana Department of Transportation ("INDOT"). Thereafter, the State and the plaintiffs entered into a settlement agreement, which provided that the State would both pay the plaintiffs monetary damages within forty-five days of signing the agreement and grant the plaintiffs an easement onto State property to install a new septic system. Specifically, paragraph five of the parties' written agreement "granted [the plaintiffs] access over State property." *Curtis*, 704 N.E.2d at 1017. Paragraph seven of the written agreement further provided that "access through State Road 10's existing guardrail and any driveway therefrom as described in paragraph five (5) of this agreement *is subject to approval by INDOT*." *Id*. (emphasis added).

[27] Forty-five days after the parties had signed the agreement, the plaintiffs filed a motion to enforce it. At that time, the State had neither made the monetary payment nor provided the easement, and neither the Governor nor INDOT had approved the agreement. Following a hearing, the trial court granted the plaintiffs' motion to enforce the agreement.

The State appealed. Because the Governor had approved the monetary award between the time of trial and appeal, "only the requirement of approval of the easement was before the Court of Appeals." *Id*. We affirmed the trial court's enforcement of the agreement. *Indiana State Highway Commission v. Curtis*, 695 N.E.2d 143 (Ind. Ct. App. 1998), *trans. granted*.

However, on transfer, our Indiana Supreme Court explained as follows:

> Construction of settlement agreements is governed by contract law. 5 I.L.E. *Compromise & Settlement* § 21 (1958). Under contract law, a condition precedent is a condition that must be performed before the agreement of the parties becomes a binding contract or that must be fulfilled before the duty to perform a specific obligation arises. *Blakley v. Currence*, 172 Ind. App. 668, 670, 361 N.E.2d 921, 922 (1977); *Capitol Land Co., Inc. v. Zorn*, 134 Ind. App. 431, 443, 184 N.E.2d 152, 158 (1962); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981) (a condition is an event that must occur before performance under a contract becomes due); 5 WILLISTON, CONTRACTS § 666 (3rd ed. 1961) (a condition precedent may be either a condition to the existence of a contract or to an immediate obligation under a contract); *accord* 17A C.J.S. *Contracts* § 338 (1963). INDOT's approval of the easement provisions is a condition of the settlement agreement. The condition was supplied by the parties when they agreed explicitly in the settlement document that the easement provisions required INDOT's approval.
>
> As a general rule, an express condition must be fulfilled or no liability can arise on the promise that the condition qualifies. 5 WILLISTON, CONTRACTS § 675 (3rd ed. 1961); RESTATEMENT (SECOND) OF CONTRACTS § 225 (1981) (if a condition does not occur, performance of a duty subject to a condition cannot become due and if the condition can no longer

occur, the duty is discharged). Indiana courts have consistently recognized this rule. The Court of Appeals held in *Blakley* that an agreement containing the clause "subject to loan approval" did not become a binding contract because approval was not obtained. 361 N.E.2d at 923. Similarly, in *Wetzel v. Andrews,* 136 Ind. App. 117, 198 N.E.2d 19 (1964), the Court of Appeals held that a lease was not valid where the condition precedent of statutorily required approval by the governmental entity was not met[.]

* * * * *

The Court of Appeals, citing *Hamlin v. Steward*, 622 N.E.2d 535, 540 (Ind. Ct. App.1993), noted the doctrine that a party may not rely on a failure of a condition precedent where that party's inaction caused the failure. *Indiana State Highway Comm'n v. Curtis*, 695 N.E.2d 143, 147 (Ind. Ct. App.1998). This does not mean that every failure of a condition results in an estoppel against asserting the condition as a proper reason to avoid the contract. Rather, as the court in *Hamlin* went on to explain, the parties "have an implied obligation to make a reasonable and good faith effort to satisfy the condition." *Hamlin*, 622 N.E.2d at 540. "Causing" the failure of a condition means more than the mere rejection of the contract for sound reason or for newly discovered information, if the right to do that is preserved in the contract. The *Hamlin* doctrine prevents a party from acts of contractual sabotage or other acts in bad faith by a party that cause the failure of a condition. Where the condition is itself the approval by some division or component of the party, however, the obligation is only to consider that approval in good faith. The mere passage of time does not create an inference of bad faith, and there is no other evidence that the State or its representatives did not act in good faith to evaluate the approval. Accordingly, the condition is available to the State as a bar to its obligations. The requirement of approval is for the benefit of the State, and the requirement that approval be obtained within forty-five days is for the benefit of the [plaintiffs]. The passage of

the time specified in the agreement gives the [plaintiffs] the right to revive their lawsuit, but it does not create an enforceable settlement. *Cf. Barrington Management Co., Inc. v. Paul E. Draper Family Ltd.,* 695 N.E.2d 135, 141-42 (Ind. Ct. App. 1998).

Finally, even in non-public contracts, it is not uncommon for a settlement agreement to require approval by some agency or organization such as a party's board of directors or to require study that cannot be accomplished in the time frame available on the courthouse steps. This may be because the agreement calls for an authority not previously given to the negotiator, because some aspect of the proposed settlement involves technical or other expertise not immediately available, or for other good reasons. Most of these approvals are given in due course. But upholding the right of a party to insist on such a condition ultimately facilitates settlement by permitting an agreement to be made with an enforceable condition, even if the condition is likely to be fulfilled. Accordingly, as a matter of contract law, because INDOT approval was required by the settlement agreement, and that approval was not obtained, the agreement, as to the easement provisions, is not enforceable.

*Curtis*, 704 N.E.2d at 1018-20.

[30] Here, our review of the record reveals that both the Governor's approval and the Attorney General's approval of the settlement provisions were conditions to the Agreement.[4] These conditions precedent were supplied by the parties when they agreed explicitly in the Agreement that the settlement provisions required both the Governor's approval and the Attorney General's approval. Further,

---

[4] We note that our Indiana Supreme Court stated in *Curtis* that "the Governor's approval is required for any compromise of a claim against the State." *Curtis*, 704 N.E.2d at 1020 (citing IND. CODE § 34-13-3-14).

the Kellys have not alleged and there is no evidence in the record that the State engaged in acts of contractual sabotage or bad faith. Because the approval of the Governor, which is statutorily required, and the approval of the Attorney General were not obtained, and, where there is no evidence in the record that the State engaged in acts of contractual sabotage or bad faith, the Agreement is not enforceable. *See id.*; *see also City of Plymouth v. Michael Kinder & Sons, Inc.*, 137 N.E.3d 312, 317 (Ind. Ct. App. 2019) (explaining that where a mediation agreement required the City of Plymouth Redevelopment Commission to approve a settlement offer of $130,000 before Kinder could accept it and the Commission did not approve the offer, the agreement was not enforceable). Accordingly, the trial court did not err in granting judgment as a matter of law in favor of the State.

[31]    Affirmed.


Tavitas, J., and Foley, J., concur.


ATTORNEY FOR APPELLANT

Brad A. Catlin
Williams Law Group, LLC
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Benjamin M.L. Jones
Section Chief of Civil Appeals

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana